UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              CRIMINAL NO. 15-20783

v.                                      HON. SEAN F. COX

LEROY CANNON,

                Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Leroy Cannon is serving a 15-year sentence for his *third* federal drug conviction. He again asks for compassionate release because of Covid-19. But like the first time, Cannon has not exhausted his administrative remedies. And in any case, his release would endanger the community. More than anything else, Cannon's uninterrupted pattern of drug trafficking—activity that spans over 30 years—shows he will continue this criminal behavior if released. So he is ineligible for relief. Moreover, a § 3553(a) analysis does not support his request.

1

## Background

In 2015, DEA agents began investigating Leroy Cannon, a drug trafficker with a prolific criminal record. This was not the first time Cannon was targeted in a federal drug investigation. In fact, Cannon had been involved in major drug trafficking since the 1970s.

In 1977 at the age of 27, Cannon was convicted for leading a large international drug organization. (PSR, ¶ 36). He controlled an extensive network of financiers and couriers who brought kilogram quantities of heroin from Mexico to Detroit, Los Angeles, and New Jersey. (*Id.*). A jury convicted him of seven criminal counts. A New Jersey federal judge then imposed an aggregate sentence of 15 to 30 years in prison. (*Id.*). Cannon was released on parole in 1994. (*Id.*). But less than two years later, he was convicted of another federal drug crime, explained below, and his parole was revoked. (*Id.*).

In 1996, Cannon tried to buy a kilo of heroin from an undercover DEA agent in Baltimore. (*Id.*, ¶ 39). Agents arrested Cannon when he came to purchase the drugs. (*Id.*). After pleading guilty, a Maryland federal judge imposed an 87-month sentence. (*Id.*). Cannon was

released and began his supervised release term in May 2005. (*Id.*). But a few months later, he was arrested again for another drug deal.

More specifically, in August 2005, Cannon and his son tried to sell cocaine to a confidential informant working with a local police department. (*Id.*, ¶ 38). The officers arrested both at the time of the deal. Cannon eventually pleaded guilty (although he continues to deny any criminal culpability related to this case). (*Id.*). A Wayne County circuit court judge imposed a four to 30 year sentence. After about five years, he was released from state custody. (*Id.*, ¶ 37). But because of the new criminal conduct, he violated his federal supervised release. For that violation, he was sentenced to 30 months in custody. (*Id.*).

Shortly after his release, he again came on the radar of DEA agents in this case. During their investigation, agents identified a confidential informant who was one of Cannon's drug customers. The informant said that he had purchased heroin, in 100- or 200-gram quantities, from Cannon. So the agents used the informant for a controlled purchase of heroin from Cannon. (PSR, ¶¶ 12-13).

Using information from this buy, agents obtained a wiretap of Cannon's phones. And during that wire, Cannon was working with

other members of his criminal enterprise to obtain large quantities of narcotics from Mexican suppliers. (*Id.*, ¶¶ 14-15).

The government eventually charged Cannon with conspiring to distribute at least one kilogram of heroin and five kilograms of cocaine (a 10-year to life offense) and distribution of at least 100 grams of heroin (a 5- to 40-year offense). PSR, ¶ 6. And because of Cannon's multiple drug trafficking convictions detailed above, the government could have filed a sentencing enhancement that would have increased his sentence to mandatory life in prison.

But the parties eventually reached a plea agreement. (R.42: Plea Agreement, 126). Cannon agreed to plead guilty to the lesser distribution charge. And the government agreed not file any sentencing enhancement. This benefited Cannon in a number of ways. First, the charge he pled to had a five-year statutory minimum sentence, instead of ten years or even mandatory life in prison. Second, because the charge also had a lower statutory maximum sentence (40 years instead of life), Cannon also had lower career offender guideline calculations, i.e., 188-235 months instead of 262-327 months. *See* USSG § 4B1.1(b)(1)-(2).

4

At sentencing, citing his age and poor health, Cannon asked the Court to impose the five-year minimum term. The government, noting the significant break it already gave Cannon, requested a guideline sentence. After hearing these arguments, the Court agreed with the government and imposed a 188-month, bottom-of-the-guidelines sentence. (R.45: Judgment, 176).

Cannon is serving that term at Milan FCI. He has over eight years remaining: His scheduled release date is December 31, 2028.

Cannon recently filed a motion for compassionate release. (R.59: Motion, 279). In it, he argues that he is at high risk if he were to contract Covid-19 because of his high blood pressure and diabetes. (*Id.*, 288). This motion should be denied.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued

6

face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at \*2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.  The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen

the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,311 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, ___

F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19

pandemic. As the Attorney General's directives have explained, the

Bureau of Prisons is basing its home-confinement decisions on several

factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These

criteria account for justifiable concerns about whether inmates "might

have no safe place to go upon release and [might] return to their

criminal activities," as well as "legitimate concerns about public safety."

*Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates

indiscriminately and unleash tens of thousands of convicted criminals,

en masse. *See id.* It must focus on the inmates who have the highest

risk factors for Covid-19 and are least likely to engage in new criminal

activity. This is true not just to protect the public generally, but to avoid

the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at \*11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and

circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of

Prisons."). It is especially true now, given the Bureau of Prisons'
substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Cannon's motion for compassionate release.

Cannon's motion for a reduced sentence should be denied. A district
court has "no inherent authority . . . to modify an otherwise valid
sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir.
2009). Rather, a district court's authority to modify a defendant's
sentence is "narrowly circumscribed." *United States v. Houston*,
529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory
exception, a district court "may not modify a term of imprisonment once
it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions
are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).
Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally
narrow.

*First*, compassionate release requires exhaustion. If a defendant
moves for compassionate release, the district court may not act on the
motion unless the defendant files it "after" either completing the
administrative process within the Bureau of Prisons or waiting 30 days
from when the warden at his facility received his request. 18 U.S.C.

§ 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020

WL 2845694, at *1 (6th Cir. June 2, 2020).

*Second*, even if a defendant exhausts, he must show "extraordinary

and compelling reasons" for compassionate release, and release must be

"consistent with" the Sentencing Commission's policy statements.

18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2),

compliance with the policy statements incorporated by § 3582(c)(1)(A) is

mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United

States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a

defendant must have a medical condition, age-related issue, family

circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety

of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a

district court may not grant the motion unless the factors in 18 U.S.C.

§ 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As

at sentencing, those factors require the district court to consider the

defendant's history and characteristics, the seriousness of the offense,

the need to promote respect for the law and provide just punishment for

the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Binding authority prohibits the Court from granting release, because Cannon has not satisfied the statutory exhaustion requirement.

The Court must dismiss Cannon's motion because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___,

14

No. 20-1298, 2020 WL 2845694, at *2 (6th Cir. June 2, 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at *1–*4; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

The Bureau of Prisons has no record of a compassionate relief (also referred to as a Reduction in Sentence request) for Cannon. He claims that he "exhausted his administrative remedies" because he made a "home confinement" request that was denied. (R.59: Motion, 284). This is true. *See* Ex. 3: Email Requests. But a request for home confinement is different. *See, e.g., United States v. Velazquez*, 2020 WL 3452070, at *2 (D. Ariz. June 24, 2020) (request for home confinement under the CARES Act does not suffice for exhaustion requirement of compassionate release); *United States v. Taylor,* No. 12-cr-20052 (E.D. Mich. July 22, 2020) (same) (Murphy, J.).

And it's Cannon who "bears the burden of showing that he exhausted his administrative rights with the BOP." *United States v. Van Sickle*, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (citing cases). It is

not enough for an inmate to simply allege he has exhausted his remedies. *See id.*

Cannon has not provided sufficient evidence that he has complied with § 3582(c)(1)(A)'s mandatory exhaustion requirement. His motion for compassionate release should therefore be dismissed for failure to exhaust. *Alam*, 2020 WL 2845694, at *5.

### A. Cannon is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Cannon had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under

16

18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of

the Bureau of Prisons," which the Bureau of Prisons has set forth in

Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Cannon and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Cannon's medical records, however, confirm that he has Type 2 diabetes and hypertension, which the CDC has identified as risk factors for Covid-19. The BOP has helped Cannon to manage these conditions, e.g., with medication. *See* Ex. 1: Cannon's 2019 Medical Records; Ex. 2: Cannon's 2020 Medical Records, *filed under seal*. Nevertheless, given the heightened risk that Covid-19 poses to someone with those medical

conditions, Cannon has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Cannon remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders— such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Drug dealing itself is a danger that Congress sought to protect the public from. And as set forth above, Cannon's criminal record shows that, if released, he would almost certainly continue in this illegal trade. Save for his time in prison, Cannon has been dealing large quantities of drugs since the 1970s. He has not been deterred despite decades in prison. In fact, he committed his last two drug offenses (including this one) when he was over 50 years old. He will not stop. And so his release would endanger the public. Section 1B1.13(2) therefore prohibits reducing his sentence under § 3582(c)(1)(A).

**B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors).

Even if the Court were to find Cannon eligible for compassionate release, the § 3553(a) factors should still disqualify him. To begin with,

the crime was a serious one, deserving of significant punishment. There is also a need for deterrence. As outlined above, Cannon already served decades in federal prison. The punishment there did not keep him from trafficking drugs. In fact, he was on supervised release and parole while committing other drug crimes. Moreover, Cannon received a significant reduction that already accounted for his age and health concerns. And he has not even served half of that sentence. When conducting a § 3553(a) analysis in the context of a compassionate release motion, a district court may properly deny relief when a defendant has "served only a fraction of her sentence." *United States v. Kincaid*, No. 19-6271, 2020 WL 2521303, at *1 (6th Cir. May 18, 2020) (affirming denial of compassionate release when defendant had served roughly 15% of original sentence).

### III. If the Court were to grant Cannon's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Cannon's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Cannon's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Steven P. Cares
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9139
Dated: August 7, 2020           Email: steven.cares@usdoj.gov

## Certificate of Service

I hereby certify that on August 7, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

/s/ Steven P. Cares
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9139
Email: steven.cares@usdoj.gov